Braylon SEIFERT, by his Guardian ad litem, Paul J. Scoptur, Kimberly Seifert and David Seifert, Plaintiffs-Respondents,

DEAN HEALTH INSURANCE and BadgerCare Plus, Involuntary-Plaintiffs,

v.

Kay M. BALINK, M.D. and Proassurance Wisconsin Insurance Company, Defendants-Appellants.†

Court of Appeals

*No. 2014AP195. Submitted on briefs September 16, 2014. —Decided July 30, 2015.*

**2015 WI App 59**

(Also reported in 869 N.W.2d 493.)

† Petition for Review filed.

694

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Samuel J. Leib* and *Brent A. Simerson* of *Wilson Elser Moskowitz Edelman & Dicker, LLP*, Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Kenneth M. Levine* of *Kenneth M. Levine & Associates, LLC*, Brookline, MA, and *Paul J. Scoptur* of *Aiken & Scoptur, S.C.*, Milwaukee.

Before Higginbotham, Sherman and Kloppenburg, JJ.

¶ 1. HIGGINBOTHAM, J. This case concerns the admission of expert testimony and alleged prejudicial statements made during closing argument in a medical malpractice suit. Braylon Seifert suffered nerve damage at birth that resulted in the permanent impairment of his left arm. Braylon brought suit by his guardian ad

litem and his parents, Kimberly and David Seifert, (collectively, Braylon) against Dr. Kay Balink, the doctor who delivered Braylon, and ProAssurance Wisconsin Insurance Company (collectively, Dr. Balink) alleging negligence and lack of informed consent. At various points during the litigation, Dr. Balink sought to exclude certain testimony of Dr. Jeffery Wener, Braylon's standard of care expert witness. Dr. Balink argued that Dr. Wener's testimony failed to meet the *Daubert*[1] standard as adopted by WIS. STAT. § 907.02(1),[2] which governs the admissibility of expert testimony. The circuit court denied each of Dr. Balink's motions to exclude Dr. Wener's testimony.

¶ 2. The jury found Dr. Balink negligent in the prenatal and delivery care of Kimberly and Braylon. The jury further found that Dr. Balink's negligence caused injury to Braylon. However, the jury found in favor of Dr. Balink on the issue of informed consent.

¶ 3. Dr. Balink appeals the circuit court's denial of her motions to exclude Dr. Wener's testimony. She also contends that Braylon's counsel made several prejudicial statements during closing argument that violated pretrial orders, which requires a new trial.[3] We disagree in all respects, and, for the reasons that follow, we affirm the judgment and order of the circuit court.

## BACKGROUND

I. *Prenatal Care, Delivery, and Dr. Wener's Testimony*

¶ 4. Dr. Balink provided prenatal care to Kimberly. During regular prenatal visits, Dr. Balink

---

[1] *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).

[2] All citations to the Wisconsin statutes are to the 2013–14 version unless otherwise noted.

[3] She also argues that the combination of Dr. Wener's

recorded Kimberly's weight as well as fundal measurements, which measure fetal growth. Kimberly weighed 269 pounds at the start of her pregnancy and she gained approximately 36 pounds during the pregnancy. Using fundal measurements, weight gain, and a physical examination, Dr. Balink estimated that Braylon would weigh eight pounds eight ounces at birth; his actual birth weight was nine pounds, twelve ounces. Dr. Balink also tested Kimberly for gestational diabetes using a one-hour glucose screening test. Kimberly's test result was 131 mg/dL. Dr. Balink testified that 131 mg/dL was within the normal range.

¶ 5. Dr. Balink also delivered Braylon. She utilized a vacuum device to assist in the delivery. After utilizing the vacuum, Braylon's head emerged, but then retracted, which led to Dr. Balink's diagnosis of shoulder dystocia.[4] In other words, Braylon was stuck. After diagnosing the shoulder dystocia, Dr. Balink directed a series of obstetrical maneuvers to dislodge Braylon's shoulder, which ultimately resulted in Braylon's birth. Braylon was later diagnosed with a brachial plexus[5] injury that permanently inhibits the growth and use of his left arm. At trial Braylon argued that Dr. Balink caused his injury by applying excessive traction while dislodging his shoulder. Dr. Balink argued that maternal forces caused the injury.

¶ 6. Before trial, Dr. Balink sought to exclude certain testimony from Dr. Wener. Dr. Wener was

inadmissible expert testimony and counsel's prejudicial statements during closing argument require a new trial in the interest of justice.

[4] Shoulder dystocia is a medical emergency that can result in nerve damage or even death due to total oxygen depletion.

[5] The brachial plexus is a series of nerves that originate in the spine and run through the neck and into the arm.

prepared to testify that Dr. Balink's conduct fell below the requisite standard of care because she (1) failed to utilize an ultrasound to estimate fetal weight just prior to birth, (2) failed to order a three-hour glucose test for gestational diabetes, and (3) should not have performed a vacuum assisted delivery.

¶ 7. In Dr. Wener's opinion, these three interrelated factors were important because together they increase the risk of shoulder dystocia. For example, in Dr. Wener's opinion, maternal obesity and gestational diabetes can result in a large baby and a larger infant is at greater risk of shoulder dystocia. He testified that the result of Kimberly's one-hour glucose test, 131 mg/dL, was abnormal; therefore, a follow-up three-hour glucose screening test was necessary to determine whether she had gestational diabetes due to the connection between gestational diabetes and elevated birth weight. Additionally, he opined that Dr. Balink should have used ultrasound to obtain a more accurate estimate of Braylon's birth weight due to Kimberly's weight and the glucose screening test result. Finally, in his opinion, Dr. Balink should not have performed a vacuumed assisted birth both because of Kimberly's weight and Braylon's weight, and because vacuum assisted birth is the "largest risk factor for causing a shoulder dystocia."

¶ 8. During a pretrial hearing on her motion to exclude Dr. Wener's testimony, Dr. Balink argued that Dr. Wener's testimony was inadmissible because it was not the product of reliable principles or methods as required by WIS. STAT. § 907.02(1), which governs the admissibility of expert testimony at trial. The circuit court denied Dr. Balink's pretrial motion to exclude Dr. Wener's testimony. The court concluded that Dr. Wener's opinions were "based on a reliable medical meth-

700

odology looking at recognized factors of the standard of care." It found that Dr. Wener used a holistic methodology to evaluate the risk factors present in Kimberly's pregnancy and delivery. It further found that medical methodology is "a little less susceptible to precise definition" due to "vagaries of medical treatment and diagnosis." We review the circuit court's decision in greater detail in our discussion below.

¶ 9. Dr. Balink renewed her challenge to Dr. Wener's testimony both during trial and postverdict. For the same reasons expressed in its pretrial decision, the court reaffirmed its decision to allow Dr. Wener's testimony.

## II. *Closing Arguments*

¶ 10. During closing arguments, Dr. Balink objected to several statements made by Braylon's counsel. The circuit court overruled the objections during trial and, in response to one statement, provided a curative instruction to the jury. In its decision on Dr. Balink's postverdict motion, the court also determined that counsel's statements were not so prejudicial as to warrant a new trial. We discuss the specific statements made during closing argument and the pretrial orders at issue in our analysis that follows.

## DISCUSSION

¶ 11. We first address Dr. Balink's argument that the circuit court improperly allowed Braylon's medical expert, Dr. Wener, to testify to the standard of care. We then turn our attention to Dr. Balink's argument that Braylon's attorney made improper and prejudicial statements during his closing argument.

## I. *The Admissibility of Dr. Wener's Testimony*

¶ 12. Dr. Balink argues that Dr. Wener's expert testimony was inadmissible under WIS. STAT. § 907.02(1) because his opinions were not based on reliable principles or methods. Specifically, she asserts: (1) Dr. Wener's testimony was based solely on his personal preferences in practicing medicine; (2) Dr. Wener did not support his opinion with reference to medical literature; and (3) Dr. Wener did not reliably apply his opinions to the facts of the case.

¶ 13. We reject Dr. Balink's arguments for the reasons that follow. We first set forth the standard of review, then examine WIS. STAT. § 907.02(1) and the *Daubert* admissibility standard, and conclude by addressing each of Dr. Balink's arguments in light of that standard.

### A. *Standard of Review*

¶ 14. This case requires us to interpret and apply WIS. STAT. § 907.02(1). Interpretation of a statute is a question of law, which we review de novo. *State v. Steffes*, 2013 WI 53, ¶ 15, 347 Wis. 2d 683, 832 N.W.2d 101. Our interpretation of § 907.02(1) is also guided by cases interpreting and applying Federal Rule of Evidence 702, which adopted the standard for the admissibility of expert opinion testimony set forth in *Daubert* and its progeny.

¶ 15. After independently considering the applicable legal framework governing the admission of expert testimony, we "review a circuit court's decision to admit or exclude expert testimony under an errone-

ous exercise of discretion standard." *State v. Giese,* 2014 WI App 92, ¶ 16, 356 Wis. 2d 796, 854 N.W.2d 687. The discretionary decision of the circuit court will not be overturned "if it has a rational basis and was made in accordance with accepted legal standards in light of the facts in the record." *Id.*

B. *Wisconsin Stat. § 907.02(1) and the Daubert Admissibility Standard*

¶ 16. The Wisconsin Legislature amended Wis. Stat. § 907.02, effective February 1, 2011, by adopting the *Daubert* standard for admission of expert witness testimony.[6] Section 907.02(1) provides, in full:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, *if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.*

(Emphasis added.) The emphasized language indicates the change brought about by the 2011 amendment, which places the emphasis on the *reliability* of the expert's testimony. Because § 907.02(1) is modeled after Federal Rule of Evidence 702, we now turn to the United States Supreme Court's analysis of Rule 702. *Compare* Wis. Stat. § 907.02(1) *with* Fed. R. Evid. 702. *See State v. Poly-America, Inc.*, 164 Wis. 2d 238, 246, 474 N.W.2d 770 (Ct. App. 1991) ("When a state statute

---

[6] *See* 2011 Wis. Act 2, §§ 34m, 45(5).

is modeled after a federal rule, we look to the federal interpretation of that rule for guidance and assistance.").

¶ 17. In *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 589 (1993), the United States Supreme Court examined Rule 702 and explained that the trial court serves as a gatekeeper to ensure that scientific testimony is both relevant and reliable. The Court explained that in order to meet this gate-keeping responsibility, the trial court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. To answer these two questions, the Court provided a list of factors that a trial court *may* utilize in its analysis. *Id.* at 593–94 (emphasis added). These factors include: (1) whether the expert's theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error" of a particular scientific technique, and (4) whether the subject of the testimony has been generally accepted. *See id.* at 593. The Court emphasized, however, that these factors did not establish "a definitive checklist or test" and that the test of reliability must be "flexible." *Id.* at 593–94.

¶ 18. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999), the Supreme Court revisited *Daubert* and clarified that the gate-keeping *Daubert* obligation is not limited to scientific testimony, but extends to all expert testimony. The *Kumho* Court explained that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142. The Court also reiterated that the *Daubert* standard must be flexible and that the factors

704

outlined in that case may not be applicable to all types of expert testimony. *See id.* at 150. It stated that the list of specific factors for determining the reliability of an expert's testimony "neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141. Furthermore, the *Kumho* Court stated that the reliability of an expert's opinion may be established based on the expert's own observations from her or his "extensive and specialized experience." *See id.* at 156.

¶ 19. In cases involving expert testimony provided by physicians, several courts have focused on the knowledge and experience of the testifying expert as an indicator of reliability under *Daubert. Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006); *Dickenson v. Cardiac and Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004); *Schneider v. Fried*, 320 F.3d 396, 406–07 (3d Cir. 2003). In doing so, these courts often draw a distinction between medical expert testimony and other scientific or specialized expert testimony due to the level of uncertainty presented when medical knowledge is applied to individualized patient treatment. *See Primiano*, 598 F.3d at 565; *see also Sandoval-Mendoza*, 472 F.3d at 655. For example, the Ninth Circuit explained, "[t]he human body is complex, etiology is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof." *Sandoval-Mendoza*, 472 F.3d at 655. In addition, the Ninth Circuit observed that medicine is a complicated science that requires physicians to make judgments and decisions based on known factors and uncertainties. *Primiano*, 598 F.3d at 565.

¶ 20. The advisory committee notes to the adoption of Federal Rule of Evidence 702 shed additional

705

light on how expert qualifications may be an important consideration under the *Daubert* standard. The committee observed,

> Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.

Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

¶ 21. With the above legal principles and standards in mind, we turn to Dr. Balink's arguments and the circuit court's reasoning for admitting Dr. Wener's testimony.

### C. *Application*

¶ 22. We first discuss the circuit court's reasoning for admitting Dr. Wener's testimony. We then address each of Dr. Balink's arguments.

### 1. *Circuit Court's Reasoning*

¶ 23. Here, the circuit court first considered the listed *Daubert* factors and determined that these factors more appropriately applied to assessing the reliability of non-medical expert opinions, and therefore they were not particularly helpful in determining the reliability of medical testimony such as Dr. Wener's. The court explained that medical methodology must be viewed as distinct from other types of scientific methodology, such as engineering, because it is not subject to precise measurement. The court also stated that

because Dr. Wener's opinion was based on the specific facts of this case, the underlying bases of Dr. Wener's opinion did not align well with the *Daubert* factor of peer review publication.

¶ 24. In addition, the court referred to Dr. Wener's methodology as "holistic," which the court observed was "less susceptible to precise definition." The court explained that Dr. Wener's opinion that Dr. Balink fell below the requisite standard of care was based on a consideration of known and generally accepted factors (elevated birth weight, maternal obesity, and glucose testing)[7] taken together and applied to the individualized facts of this case.

¶ 25. The circuit court acknowledged that "how an individual physician adds [the factors] up is debatable," however, the court reasoned, that is not the equivalent of not being reliable. The court also acknowledged that Dr. Wener's "holistic" methodology likely could be tested, but the court went on to say that "a lot of things in medicine can't be tested because you can't repeat the exact same factors because every human body is different." The court rejected the notion that Dr. Wener's methodology was "junk science" and that he was a "junk scientist." The court reasoned that Dr. Wener was qualified by his education and experience and "ongoing learning."

¶ 26. The court concluded its assessment of the reliability of Dr. Wener's opinion by stating that "[Dr. Wener's] ultimate opinion used recognized factors subject to cross examination from which he concluded that the standard of care was not applied when looking at those factors." The court acknowledged that the reli-

---

[7] Dr. Balink does not argue that these factors are not generally accepted by the medical community.

ability of Dr. Wener's opinion was a "close call," but concluded that Dr. Wener's opinion was "reliably based on a reliable medical methodology looking at recognized factors of the standard of care."

¶ 27. Having set forth the circuit court's reasoning in admitting Dr. Wener's testimony, we address Dr. Balink's arguments that the court erred in admitting that testimony.

### 2. *Qualifications and Personal Preferences*

■

¶ 28. Dr. Balink argues that Dr. Wener's opinion is unreliable because Dr. Wener's opinion is based solely on his own personal preferences derived from his extensive experience practicing medicine. Specifically, Dr. Balink argues that although Dr. Wener is qualified, for his opinions to be reliable under *Daubert*, they must be based on more than his personal preferences, in light of his experience, to utilize ultrasound for birth weight estimates, to order additional glucose testing, and to avoid vacuum assisted deliveries. Dr. Balink relies on the five-factor test from *Daubert* and Rule 702 to support her view that Dr. Wener's opinions are unreliable because experiences cannot be "challenged in some objective sense." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

¶ 29. Dr. Balink's argument misses the mark. First, she ignores the Supreme Court's statement in *Kumho Tire* that a court may consider personal experience and knowledge when determining the reliability of expert testimony. Second, she ignores language in the advisory committee's note to the 2000 amendments to Rule 702 to the same effect. Third, she fails to recognize, in contravention of several federal court

decisions, that consideration of the knowledge and expertise of a testifying physician may be particularly useful in evaluating the reliability of medical expert testimony. Finally, Dr. Balink does not challenge Dr. Wener's qualifications in any way. Therefore, to the extent that the circuit court relied on Dr. Wener's expertise and knowledge as a practicing physician when it admitted his testimony, it did not erroneously exercise its discretion.

### 3. *Medical Literature*

¶ 30. Dr. Balink argues that Dr. Wener undermined the reliability of his testimony by refusing to rely on applicable medical literature. For example, Dr. Balink criticizes Dr. Wener's failure to rely on the American College of Obstetrics and Gynecology's recommended threshold screening level of either 130 mg/dL or 140 mg/dL for the one-hour glucose test. Arguing more generally, Dr. Balink is also critical of Dr. Wener resting his opinions on methods developed based on his treatment of patients, rather than on literature, studies, or science. Dr. Balink's argument again misses the mark.

¶ 31. As we have explained, reliance on peer reviewed publications is just one factor that courts *may* consider under *Daubert*. The Supreme Court in *Daubert* and in *Kumho* emphasized that the factors listed in *Daubert* are guidelines to assist the court to determine the reliability of an expert's opinion, and that the court is afforded flexibility in deciding which factors are appropriate for the particular circumstances of each case. Here, the court's analysis was not strictly tied to consideration of whether Dr. Wener's

709

opinions were reliable based on medical literature. Instead, as we discussed above, the court considered other pertinent factors to determine the reliability of Dr. Wener's testimony. Dr. Balink does not provide a persuasive reason why the court improperly exercised its discretion when it admitted Dr. Wener's testimony even though Dr. Wener did not base his testimony on medical literature.

### 4. *Opinion Reliably Applied*

¶ 32. Finally, Dr. Balink argues that Dr. Wener's testimony is not reliable because he failed to reliably apply his opinions to the facts of the case. She points to several specific examples in which she argues that Dr. Wener provided confusing testimony, which she argues demonstrates unreliability.[8] We disagree.

¶ 33. Dr. Wener testified about the risk factors for shoulder dystocia and opined that the presence and combination of these risk factors required Dr. Balink to estimate fetal weight using ultrasound, order additional testing for gestational diabetes, and refrain from a vacuum assisted delivery. Whether or not Dr. Wener's testimony on these issues could be weakened or discredited on cross-examination, through other expert testimony, or by argument (such as that noted in footnote 8 *supra*) speaks not to the reliability of Dr. Wener's opinions, but to their weight. "Shaky but

---

[8] For example, Dr. Balink argues that Dr. Wener testified that acceptable thresholds for diagnosing macrosomia (excessive birth weight) is either 4000 or 4500 grams and that he would consider Braylon, who weighed 3856 grams at birth, to have macrosomia under both thresholds.

admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564; *see also Kumho Tire*, 526 U.S. at 153 (when conflicting expert testimony is presented, as in this case, the jury must be given the opportunity to weigh such testimony); *Giese*, 356 Wis. 2d 796, ¶ 23 ("the mere fact that experts may disagree about the reliability of [a certain methodology] does not mean that testimony about [that methodology] violates the *Daubert* standard").

¶ 34. Based on the above reasons, we conclude that the circuit court did not erroneously exercise its discretion when it admitted Dr. Wener's expert testimony. We reach this decision by keeping in mind the broad leeway that is to be accorded to the circuit court both as to how to assess the reliability of expert opinion testimony as well as to its final determination of reliability. As the circuit court explained, Dr. Wener's opinion may have been debatable, but it was reliable because of his qualifications and experience, and because it was based on known and recognized factors and on his "holistic" methodology of considering these factors together, taking into account the individualized facts of this case. We are satisfied that the court's conclusion that Dr. Wener's methodology and his opinion were reliable is in keeping with the principles and standards of *Daubert, Kumho Tire*, and federal court decisions specifically addressing expert testimony of physicians. Accordingly, we affirm the circuit court's decision to admit Dr. Wener's expert testimony.[9]

---

[9] Because we affirm the circuit court's decision to admit Dr. Wener's testimony, we do not address Dr. Balink's argument that Dr. Wener's inadmissible testimony undermined confidence in the jury's verdict.

## II. *Closing Arguments*

¶ 35. Dr. Balink argues that statements made by Braylon's counsel during closing argument violated pretrial *in limine* orders. She also argues that opposing counsel made additional statements during rebuttal closing argument that were demeaning toward defense counsel and that suggested that the jurors were experts. Dr. Balink contends that the statements prejudiced her defense and, viewed cumulatively, require a new trial. In response, Braylon argues that counsel did not violate the pretrial orders and that counsel's statements were "not so egregious as to warrant a new trial."

¶ 36. We review the circuit court's decision to deny a motion for a new trial based on allegedly prejudicial statements made by opposing counsel under the erroneous exercise of discretion standard. *Wagner v. American Family Mut. Ins. Co.*, 65 Wis. 2d 243, 249, 222 N.W.2d 652 (1974).[10] To find that the circuit court erroneously exercised its discretion, we must conclude that the statements at issue affirmatively prejudiced Dr. Balink. *See id.* In other words, we "must be convinced that the verdict reflects a result

---

[10] Generally speaking, to preserve the issue of prejudicial statements made during closing argument, the offended party must object and bring a motion for a mistrial. *Hansen v. State*, 64 Wis. 2d 541, 551–52, 219 N.W.2d 246 (1974). Dr. Balink lodged a contemporaneous objection and brought the alleged errors before the circuit court in her postverdict motion; however, she did not bring a motion for a mistrial. Regardless, we exercise our discretionary authority to reach her claims that opposing counsel's statements during closing prejudiced her defense. *See Pophal v. Siverhus*, 168 Wis. 2d 533, 545, 484 N.W.2d 555 (Ct. App. 1992).

which in all probability would have been more favorable to the complaining party but for the improper argument." *Id.*

¶ 37. For the reasons that follow, we conclude that the statements at issue do not rise to the level required for a new trial and therefore, the circuit court did not erroneously exercise its discretion when it denied Dr. Balink's postverdict motion. We address each of the alleged prejudicial statements as follows.

A. *Rules of the Road Prohibition*

▆▆▆▆

¶ 38. In a pretrial motion *in limine,* Dr. Balink and the Injured Patients and Families Compensation Fund both asked the court to prohibit Braylon's counsel from indicating that medical negligence is analogous to the failure of an average driver to follow the rules of the road (Rules of the Road prohibition). The court granted both motions. During closing argument, on the topic of gestational diabetes testing thresholds, Braylon's counsel argued to the jury that Dr. Balink ignored the accumulation of risk factors in this case and compared that to a driver who fails to reduce his or her vehicle speed during inclement weather. Counsel stated,

> Thank you. Okay, well, on a nice, beautiful sunny day, clear skies, 65 miles an hour is probably fine. But there may be factors that you have to consider that would make that not fine. That would make you question whether that's the speed you should be going.
>
> Let's say it's pouring rain, let's say it's snowing. You're not going to look at that number the same. And Dr. Wener, who I'll talk about in a moment, explained that to you. And this is the issue in this case about gestational diabetes.

713

No one is denying that they're throwing these two numbers out; 130 and 140. But what he tried to explain to you was when you have a big mom, who has an increased risk of gestational diabetes because of her weight, and an increased risk of a big baby because of her weight, you've got to consider which of these numbers you're going to use.

His point was what's safe at one speed might not be at another. And that you have to consider those issues.

¶ 39. The court overruled Dr. Balink's contemporaneous objection. In its postverdict decision, the court found that counsel's analogy did "bump[] up on the motion in limine," but that it was unlikely that the jury took the argument as a comparison between ordinary negligence and medical negligence and that the argument did not "so pollute[] the record that the verdict ought to be changed."

¶ 40. We agree with the circuit court and conclude that counsel's analogy did not violate the court's pretrial order. The court's order prohibited counsel from using a Rules of the Road analogy to make a comparison of ordinary negligence to medical negligence. While counsel's analogy during his closing argument did involve speed limits, it did not suggest that medical negligence and ordinary negligence are comparable. Rather the analogy illustrated the interplay of the alleged risk factors present in this case through a comparison to the interplay of various weather conditions that might affect a driver's decision-making process. Accordingly, we conclude that the analogy did not violate the court's pretrial order.

██ ██

¶ 41. We further conclude that the analogy did not prejudice the defense because there is no indication

that the absence of this analogy would have resulted in a different verdict. First, this analogy pertained to gestational diabetes testing thresholds, which was just one aspect of the evidence presented to the jury on the issues of prenatal care and informed consent. Second, the court instructed the jury that its decision must be based on the evidence before it and that evidence did not include statements made during closing argument. Jurors are presumed to follow a court's instructions. *State v. Pitsch*, 124 Wis. 2d 628, 645 n.8, 369 N.W.2d 711 (1985).

B. *"Golden Rule" Prohibition*

■■■

¶ 42. Golden rule arguments arise when counsel asks "the jurors to place themselves in the position of someone claiming injury or damage and asks[] the jurors to determine what they would want as compensation." *State v. DeLain*, 2004 WI App 79, ¶ 23, 272 Wis. 2d 356, 679 N.W.2d 562. This type of argument is typically prohibited. *Id.* Here, the court specifically prohibited Braylon's counsel from making statements that might suggest that the jury can determine whether medical negligence occurred based on the juror's "own knowledge, experience, common sense, or . . . what a juror would 'want' or 'deserve.' " (Golden Rule prohibition.)

¶ 43. Dr. Balink argues that opposing counsel violated the Golden Rule prohibition on two occasions. In the first statement counsel remarked,

> Now, you heard some testimony from the defense experts, and I'll talk about them as I go along in this case as well and their bias, where they're coming from. You heard somebody actually get up on the witness

stand and say — Dr. Rouse, I think it was — if it was 139, I wouldn't have done anything. Really? If it was 139, I would have done nothing different. Is that reasonable to you? Is that reasonable medicine to you? Is that how you want your doctor to care?

Later, counsel also stated, "Is that what you want? You want a doctor to treat you, or you want a doctor to say, well, you're at 139. You're not at 140. No test for you. Or do you want a doctor to think about you?"

¶ 44. Dr. Balink's counsel objected to both statements. The court did not strike either statement, but it did give a curative instruction after Dr. Balink's counsel objected to another "Golden Rule"-type statement that occurred between the two statements at issue.[11] The court later ruled in its postverdict decision that counsel's statements were "not a classic golden rule violation, where the jurors were explicitly asked to place themselves in the position of the plaintiff." The court also noted that it provided a curative instruction to the jury.

¶ 45. Whether a "Golden Rule" statement requires a new trial will depend on "the nature of the case, the emphasis upon the improper measuring stick, the reference in relation to the entire argument, the likely impact or effect upon the jury." *Id.* The circuit court is in the best position to evaluate these factors. *Id.*

 

¶ 46. We conclude that the circuit court did not erroneously exercise its discretion when it denied Dr.

---

[11] The curative instruction followed counsel's remark: "How do you want to be with your healthcare? Do you want to be a participant in your healthcare?"

Balink's motion for a new trial based on the "Golden Rule"-type statements at issue. First, these statements are not pure violations of the "Golden Rule" because counsel did not explicitly ask the jury to place themselves in the plaintiffs' shoes. Second, even if we considered these statements to violate the "Golden Rule," the court provided a curative instruction to the jury that communicated to them that they should not rely on these types of statements. Finally, these statements referred to the issue of gestational diabetes testing, which formed only a portion of the argument made to the jury on prenatal care and informed consent. Taken in light of the entire argument presented to the jury, these statements did not affirmatively prejudice Dr. Balink. In sum, we conclude that the court properly exercised its discretion in denying Dr. Balink's "Golden Rule" objections.

## C. *Rebuttal Closing Argument Statements*

¶ 47. Dr. Balink also points to numerous statements made during rebuttal closing argument by opposing counsel that she contends (1) disparaged her attorney, and (2) suggested that the jurors were experts. As representative examples of these statements, plaintiff's counsel made statements such as "Unlike Mr. Leib, I think you're smart people and I think you've learned the medicine and I think you are experts in a sense" and

> I spoke to you in my closing argument and I addressed issues. I didn't tell you what to do. I didn't tell you you're not experts. I didn't tell you you're not that smart. I didn't tell you [you] don't know the law. Apparently I have a little more respect for you than Mr. Leib does.

717

The court sustained an objection to the first statement described above and later ruled that the statements were not improper when taken in context.

¶ 48. We conclude that the circuit court did not erroneously exercise its discretion when it determined that counsel's statements during rebuttal closing argument did not warrant a new trial. The circuit court considered the rebuttal statements at issue in the context in which they occurred and concluded that the statements were used to empower the jury to weigh the conflicting expert testimony and make the required credibility determinations. We see no error in the circuit court's approach.

¶ 49. Accordingly, having concluded that opposing counsel's statements during closing argument did not violate the Rules of the Road prohibition or the "Golden Rule" prohibition and that counsel's statements during rebuttal closing argument were not improper, we affirm the circuit court.[12]

## CONCLUSION

¶ 50. For the reasons stated, we affirm the judgment and order of the circuit court.

*By the Court.*—Judgment and order affirmed.

---

[12] Dr. Balink argues that the combination of Dr. Wener's unreliable opinion and opposing counsel's prejudicial statements presents exceptional circumstances that require a new trial in the interest of justice. However, having determined that the circuit court did not erroneously exercise its discretion when it admitted Dr. Wener's expert opinion or when it denied Dr. Balink's motion for a new trial based on the alleged prejudicial statements, we conclude that a new trial in the interest of justice is not warranted.