FILED
United States Court of Appeals
Tenth Circuit

June 7, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOSEPH ALLEN HERNANDEZ,

    Defendant - Appellant.

No. 23-7024

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. 6:21-CR-00096-CBG-1)**
_____

Stuart W. Southerland, Assistant Federal Public Defender (Scott A. Graham, Interim Federal Public Defender, and Robert Ridenour, Assistant Federal Public Defender, with him on the briefs), of the Office of the Federal Public Defender, Eastern District of Oklahoma, Muskogee, Oklahoma, for Defendant-Appellant.

Jarrod Leaman, Assistant United States Attorney (Christopher J. Wilson, United States Attorney, and Linda A. Epperley, Assistant United States Attorney, with him on the briefs), of the Office of the United States Attorney, Eastern District of Oklahoma, Muskogee, Oklahoma, for Plaintiff-Appellee.
_____

Before **BACHARACH**, **BALDOCK**, and **KELLY**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

This case arises from an investigation into a mobile home fire that led to two deaths. The government accused Mr. Joseph Allen Hernandez of intentionally setting the fire and supported the accusations with expert testimony by a fire investigator. For that expert testimony, the investigator entered the scene and examined it, took photographs, and interviewed witnesses.

During this investigation, Mr. Hernandez said that he had accidentally started the fire. At trial, the fire investigator was asked about this explanation; he expressed disbelief.

The trial resulted in convictions on

- two counts of second-degree murder in Indian Country and

- one count of arson in Indian Country.

We consider three issues:

1. Whether the district court abused its discretion in allowing the fire investigator to give expert testimony?

2. Whether the district court erred by allowing the fire investigator to testify that he hadn't believed Mr. Hernandez's explanation?

3. Whether the fire investigator's entry onto the scene intruded on a reasonable expectation of privacy?

We answer *no* to each question.

**1.    The fire kills Mr. Hernandez's mother and grandmother.**

The case began with the arrival of emergency responders as a fire engulfed a mobile home. Mr. Hernandez's mother and grandmother were in

2

the mobile home and suffered severe burns. Mr. Hernandez's mother told emergency responders that her son, Mr. Hernandez, had doused her with gasoline and lit her on fire. Mr. Hernandez's grandmother similarly told emergency responders that her grandson had poured gasoline on her and lit both women on fire. Both women later died from their injuries.

Mr. Hernandez was burned, too, and told an emergency responder: "I was mad, and I shouldn't have done it. Just help me." R. vol. 3, at 403–04. But he then gave a different explanation to the police, saying that he had been smoking and "messing" with a gasoline can when it exploded. *Id.* at 385.

## 2.    A fire investigator studies the fire's cause and origin.

A fire investigator (Mr. Gene Wheat) soon arrived and talked to police and Mr. Hernandez, who said "that he had been cleaning with some gasoline and smoking a cigarette and it had ignited." R. vol. 3, at 522. Mr. Wheat then

- spoke to other eyewitnesses,

- diagrammed the locations of Mr. Hernandez's mother and grandmother, and

- spotted other potential ignition sources, including the grandmother's wheelchair and a lawn mower.

But Mr. Wheat couldn't enter the mobile home because of the fire. So he returned the next morning, photographing the scene and analyzing it for evidence of the fire's origin.

3

**3.      The district court didn't err in allowing the fire investigator's expert testimony.**

Before trial, the government presented Mr. Wheat as an expert witness to testify about the fire's "cause and origin." Mr. Hernandez moved to exclude this testimony as unreliable. The district court ultimately allowed Mr. Wheat to testify as an expert witness, and Mr. Hernandez challenges this ruling.

**3.1    We apply the abuse-of-discretion standard to the district court's decision to allow Mr. Wheat's expert testimony.**

The district court has wide discretion to admit or exclude expert testimony. *Hall v. Conoco Inc.*, 886 F.3d 1308, 1311 (10th Cir. 2018). In exercising this discretion, the court must determine whether the proposed testimony is reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This determination includes the scientific validity of "the reasoning and methodology underlying the expert's opinion." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003). And on the ultimate question of admissibility, the district court must consider the requirements of Federal Rule of Evidence 702. This rule allows expert testimony only if it

- would help the fact-finder understand the evidence,

- is "based on sufficient facts or data,"

- results from reliable principles and methods, and

4

- rests on a reasonable application of principles and methods to the facts of the case.

Fed. R. Evid. 702.

In considering the district court's application of these requirements, we apply the abuse-of-discretion standard. *Hall*, 886 F.3d at 1311; *Goebel*, 346 F.3d at 990. We reverse only if the district court's assessment of reliability or admissibility

- was arbitrary, capricious, whimsical, or manifestly unreasonable or

- showed a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.

*United States v. Foust*, 989 F.3d 842, 845 (10th Cir. 2021).

### 3.2    Mr. Hernandez doesn't dispute Mr. Wheat's three opinions allowed into evidence.

The district court permitted Mr. Wheat to testify about three opinions:

1. The fire had originated in the mobile home near the breezeway.

2. The fire had likely been caused by the ignition of an accelerant (ignitable liquid).

3. It is difficult to light gasoline with a cigarette.

R. vol. 1, at 221–26.[1]

---

[1]    Mr. Wheat also opined that

- the fire had originated from the bodies of both the mother and grandmother and

5

In his briefs, Mr. Hernandez doesn't say which opinions should have been excluded. When questioned at oral argument, Mr. Hernandez conceded that he didn't dispute any of the three opinions. Oral Argument at 13:12–16:12. Given this concession, Mr. Hernandez has apparently waived his challenge to the district court's rulings on reliability and admissibility.

### 3.3    The district court could reasonably find adequate compliance with the NFPA 921 guidelines.

Even if this concession hadn't waived Mr. Hernandez's evidentiary challenge, we would reject it.

Mr. Hernandez argues that the district court should have excluded Mr. Wheat's testimony because it had deviated from the National Fire Protection Association's 921 guidelines. These guidelines set professional standards for fire investigations. Nat'l Fire Prot. Ass'n, *NFPA 921: Guide*

---

- the separate points of origin had indicated that the fire was likely not accidental.

The district court excluded testimony about these opinions, and their admissibility is not at issue.

But Mr. Hernandez argues that these opinions conflicted with Mr. Wheat's opinion that the fire had only a single point of origin. For this argument, the district court concluded that irrespective of a potential inconsistency, Mr. Wheat could reliably opine that the fire had a single point of origin. We discuss the reliability of that testimony in Part 3.3. In any event, Mr. Hernandez's explanation for the fire also involved a single point of origin. *See* p. 10 n.4, below.

*for Fire and Explosion Investigations* (2017 ed.).[2] Other courts have "consistently accepted [the NFPA 921 guidelines] as a suitable foundation for fire investigation testimony." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1029 (9th Cir. 2022).

These guidelines provide flexible recommendations, not strict requirements. *See* Nat'l Fire Prot. Ass'n, *NFPA 921: Guide for Fire & Explosion Investigations* §§ 18.1, 19.1 (2017 ed.) ("recommend[ing] a methodology to follow in determining the origin [and cause] of a fire"); *id.* § 18.2.5 ("This recommended methodology serves to inform the investigator but is not meant to limit the origin determination to only this procedure."). That flexibility is apparent throughout the guidelines. *See, e.g.*, *id.* § 18.1.2 (stating that the origin should be determined based on "one or more" of four mechanisms); *id.* §§ 18.2.2, 19.2.2 (stating that investigators can simultaneously perform various tasks); *id.* § 18.3.2.4.4 (allowing investigators to remove items from the scene or leave them where they are).

The district court could reasonably conclude that Mr. Wheat had followed the guidelines because he

- had appropriately relied on witness statements,

- had sought evidence bearing on those statements, and

---

[2]    Mr. Wheat testified that when the fire took place, the 2017 edition had been in effect. R. vol. 3, at 138.

- hadn't ignored important facts.

Mr. Wheat began investigating by interviewing witnesses, including the victims and Mr. Hernandez himself. Both victims stated that Mr. Hernandez had doused them with gasoline and lit them on fire. Mr. Hernandez faults Mr. Wheat for starting with witness statements, arguing that he strayed from the scientific method. For this argument, Mr. Hernandez points to the guideline's admonition to avoid *expectation bias*, described as a fire investigator's arrival at a conclusion before considering all the relevant data. Nat'l Fire Prot. Ass'n, *NFPA 921: Guide for Fire and Explosion Investigations* § 4.3.8–9 (2017 ed.).

In addressing this argument of expectation bias, the district court had to exercise its discretion based on the contentions and information presented. *See United States v. Herrera*, 51 F.4th 1226, 1277 (10th Cir. 2022) (stating that "we evaluate the district court's exercise of discretion based on the information presented at the time of the ruling"). That information included Mr. Hernandez's motion to exclude the testimony, which contained no mention of expectation bias.

In the hearing itself, the defense's expert witness did testify that

- investigators risk expectation bias when they start by talking to witnesses and

- Mr. Wheat had apparently "relied totally" on Mr. Hernandez's criminal history.

8

R. vol. 3, at 241–42. Ultimately, however, the defense expert said only that Mr. Wheat "may" have harbored an expectation bias by talking to witnesses and considering Mr. Hernandez's criminal history. *Id.* at 242, 244.[3] The defense expert didn't testify that Mr. Wheat had actually harbored expectation bias.

Given what had been presented, the district court could reasonably exercise its discretion to allow Mr. Wheat's opinion testimony. After all, Mr. Hernandez didn't even allege expectation bias in his motion. Granted, his expert witness expressed an opinion that fire investigators shouldn't start with witness statements. But the guidelines themselves don't prohibit investigators from starting with witness statements; the guidelines say only that fire investigators should wait until after they have reviewed all the data before reaching conclusions. *See* Parisa Dehghani-Taffi & Paul Bieber, *Folklore and Forensics: The Challenges of Arson Investigation and Innocence Claims*, 119 W. Va. L. Rev. 549, 586 (2016) ("Although NFPA 921 mentions . . . expectation . . . bias and warns the investigator to avoid presumption, nothing is said to assist the investigator in recognizing the factors that contribute to the bias or the safeguards designed to prevent

---

[3]      In a reply brief, Mr. Hernandez also suggests that questioning Mr. Wheat about his reliance on criminal history would create unfair prejudice. But this suggestion didn't appear in Mr. Hernandez's opening brief. Making this suggestion in the reply brief was too late. *United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013).

it."). And there's no evidence that Mr. Wheat reached any conclusions before he finished analyzing the data.[4]

Mr. Wheat did start by talking to witnesses, including Mr. Hernandez himself. But the NFPA 921 guidelines highlight the importance of witness statements:

- "Witness statements, the investigator's expertise, and fire-fighting procedures play important roles in the determination of the fire origin." Nat'l Fire Prot. Ass'n, *NFPA 921: Guide for Fire and Explosion Investigations* § 18.2.5 (2017 ed.).

- "Observations by witnesses are data that can be used in the context of determining the origin. Such witnesses can provide knowledge of conditions prior to, during, and after the fire event." *Id.* § 18.3.3.15.

- "Information should be sought from persons having knowledge (such as occupants) about recent activities in the area of origin and what fuel items should or should not have been present." *Id.* § 19.3.1.6.

The NFPA 921 guidelines thus don't prohibit fire investigators from starting with witness statements. *See, e.g.*, *id.* §§ 18.2.2, 19.2.2 (stating that a fire investigator can interview witnesses while conducting other analyses). So the district court could reasonably reject criticism of Mr. Wheat's decision to start with witness interviews.

---

[4]    In the district court's oral argument, Mr. Hernandez asserted only that Mr. Wheat had concluded on the first day that the fire started in one place. Mr. Hernandez's explanation for the fire would also have involved a single point of origin.

Mr. Hernandez claims that even apart from the timing, Mr. Wheat relied too heavily on witness interviews. For example, Mr. Hernandez points to Mr. Wheat's admission that he relied in part on where the witnesses had been when they saw one of the victims. But the guidelines say that "[i]n some instances, a single item, such as . . . a credible eyewitness to the ignition, . . . may be the basis for a determination of origin [or cause]." Nat'l Fire Prot. Ass'n, *NFPA 921: Guide for Fire and Explosion Investigations* §§ 18.2.1.2, 19.2.1 (2017 ed.); *see also id.* § 18.8.3 (stating that when "determination of the fire's cause [is] very difficult, or impossible . . . a witness may be found who saw the fire in its incipient stage and can provide the investigator with an area of fire origin"). The guidelines thus underscore the importance of witness interviews, "instruct[ing] fire investigators to rely on the observations of witnesses and property owners when determining the origin and cause of a fire." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1028 (9th Cir. 2022). Given this instruction in the guidelines themselves, the district court didn't exceed its discretion by allowing Mr. Wheat to rely in part on the witness statements.

Moreover, Mr. Wheat didn't rely on witness statements alone. The guidelines require fire investigators to "conduct as thorough an investigation as possible to collect data that can support or refute the witness statements." Nat'l Fire Prot. Ass'n, *NFPA 921: Guide for Fire and*

11

*Explosion Investigations* § 18.3.3.15 (2017 ed.). For this investigation, the NFPA 921 guidelines also recommend consideration of

- fire patterns,

- fire dynamics,

- arc mapping,

- fire damage,

- fuel systems, and

- electrical systems.

*Id.* § 18.1.2 (2017 ed.) (fire patterns, fire dynamics, and arc mapping); *id.* § 18.3.1.5.2 (fire damage); *id.* § 18.3.3.4 (fuel systems and electrical systems); *id.* § 18.3.3.6 (electrical systems).

Mr. Wheat examined all these sources of information except arc mapping.[5] Mr. Hernandez's expert witness criticized that omission, testifying that arc mapping is "industry standard." R. vol. 3, at 248. But Mr. Wheat explained that fire investigators don't usually use arc mapping for fires in Eastern Oklahoma. And Mr. Hernandez didn't tell the district court how arc mapping could have affected Mr. Wheat's three opinions allowed into evidence. *Cf.* Parisa Dehgani-Taffi & Paul Bieber, *Folklore*

---

[5]    "Arc mapping is a technique in which the investigator uses the identification of locations of electrical arcing to help determine the area of origin." Int'l Ass'n of Fire Chiefs, *Fire Investigator: Principles and Practice to NFPA 921 and 1033* 263 (4th ed. 2016).

*and Forensics: The Challenges of Arson Investigation and Innocence Claims*, 119 W. Va. L. Rev. 549, 560 (2016) (stating that no published research exists on the ability to identify a fire's point of origin based on arc mapping).

In similar cases, the Eighth Circuit has upheld characterization of expert testimony as sufficiently reliable when based on witness interviews, examination of the scene, and identification of areas of origin. *See Manuel v. MDOW Ins. Co.*, 791 F.3d 838, 846 (8th Cir. 2015) (fire investigator examined the site and spoke with witnesses); *Russell v. Whirlpool Corp.*, 702 F.3d 450, 457–58 (8th Cir. 2012) (fire investigator didn't conduct arc-mapping but did interview the homeowner, document the scene, examine burn patterns, and identify the area of origin); *Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1257 (8th Cir. 2006) (fire investigator considered burn patterns and identified a point of origin). The district court could reasonably rely on Mr. Wheat's investigation as reliable, too.

Despite Mr. Wheat's consideration of fire patterns, fire dynamics, fire damage, fuel systems, and electrical systems, Mr. Hernandez alleges a failure to

- investigate a witness's description of a loud noise,

- examine Mr. Hernandez's burns,

- diagram all potential ignition sources,

- collect a gasoline can at the scene,

13

- create a log for photographs or take measurements,

- consider the possibility of gasoline vapor as a cause,

- locate an ignition source that might fit Mr. Wheat's explanation, and

- preserve the scene.

Mr. Hernandez never mentioned these alleged deficiencies in his motion to exclude the testimony. Granted, he did question Mr. Wheat about the failure to collect a gasoline can, the failure to diagram other ignition sources, the possibility of gasoline vapor as a cause, and the lack of an ignition source for the accelerant. E.*g.*, R. vol. 3, at 194 (failure to collect gasoline can); *id.* at 205 (failure to diagram other heat sources); *id.* at 207–08 (failure to collect weather data in connection with the potential of gasoline vapor as a cause); *id.* at 174 (failure to find an ignition source for the accelerant). Mr. Hernandez's expert witness also testified about some of these matters. *Id.* at 243–44 (testifying that expectation bias may have "blinded" Mr. Wheat to the potential impact of gasoline vapor in the air); *id.* at 247 (testifying that Mr. Wheat had violated the guidelines by failing to evaluate other sources of ignition); *id.* at 249 (testifying that Mr. Wheat had neglected to preserve the scene). And Mr. Hernandez mentioned some of the alleged deficiencies in his argument to the district court. *Id.* at 274 (failure to preserve the scene); *id.* at 275 (failure to make a photo log or take measurements); *id.* at 276 (failure to diagram other ignition sources).

14

But Mr. Wheat explained several of these alleged lapses. For example, he explained that he had photographed the gasoline can and left it at the scene. The district court could credit this explanation because the guidelines allow investigators to decide whether to remove items from the scene. Nat'l Fire Prot. Ass'n, *NFPA 921: Guide for Fire and Explosion Investigations* § 18.3.2.4.4 (2017 ed.).

Mr. Hernandez also criticized Mr. Wheat for failing to find an ignition source for his theory involving an accelerant. But Mr. Hernandez doesn't explain how the failure to find an ignition source would have violated the guidelines.

Granted, Mr. Wheat didn't diagram other ignition sources and Mr. Hernandez criticizes this omission. The guidelines do recommend identification of fuels present in the building or the area of interest. Nat'l Fire Prot. Ass'n, *NFPA 921: Guide for Fire and Explosion Investigations* § 18.3.3.2 (2017 ed.). But Mr. Wheat explained that these sources had been too far from the point of origin to serve as a realistic ignition source. R. vol. 3, at 204–05. So the district court could reasonably conclude that Mr. Wheat hadn't violated the guidelines by failing to diagram other ignition sources. *See Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1257 (8th Cir. 2006) (upholding introduction of testimony by an expert witness who had failed to note other appliances outside "the area of origin").

15

Mr. Hernandez also criticizes Mr. Wheat for failing to consider the weather conditions and the possible vaporizing effect on gasoline. But the guidelines recommend consideration of weather factors only if they could have influenced the fire. Nat'l Fire Prot. Ass'n, *NFPA 921: Guide for Fire and Explosion Investigations* § 18.3.3.5 (2017 ed.). And Mr. Wheat explained that there was no reason to think that the weather had contributed to the fire.

Mr. Wheat acknowledged some deviations from the guidelines. R. vol. 3, at 183 (acknowledging a failure to maintain the fire scene); *id.* at 184–85 (acknowledging the lack of a photo log); *id.* at 189 (acknowledging a lack of measurements recommended in the guidelines). But Mr. Hernandez doesn't explain how these deviations could have affected Mr. Wheat's three opinions allowed into evidence.

Finally, Mr. Hernandez presented his own expert witness to testify about these alleged deviations from the guidelines. But he conceded that

- he had never heard of a cigarette igniting gasoline,

- he didn't know of any evidence refuting the victims' statements about the fire's origin, and

- Mr. Hernandez's explanation for the fire wouldn't explain the accelerant found on the mother's body.

These concessions support the reliability of Mr. Wheat's investigation.

Despite his own expert witness's concessions, Mr. Hernandez relies on

16

- *Philmar Dairy, LLC v. Armstrong Farms*, No. 18-cv-0530 SMV/KRS, 2019 WL 3070588 (D.N.M. July 12, 2019),

- *Bryte ex rel. Bryte v. American Household, Inc.*, 429 F.3d 469 (4th Cir. 2005), and

- *Pride v. BIC Corp.*, 218 F.3d 566 (6th Cir. 2000).

These cases don't suggest an abuse of discretion here.

In *Philmar Dairy*, the district court excluded the fire investigator's testimony. 2019 WL 3070588, at *10. But this ruling doesn't mean that the court would have erred if it had allowed the expert testimony. *Melton v. Deere & Co.*, 887 F.2d 1241, 1245 (5th Cir. 1989).

In *Bryte*, the Fourth Circuit upheld exclusion of expert testimony under the abuse-of-discretion standard. *Bryte*, 429 F.3d at 478. But "the idea of discretion necessarily means that the court has room to decide the issue either way without committing error." *Melton*, 887 F.2d at 1245.

And *Pride* involved an investigator's methods for testing a manufacturing defect where there weren't any witnesses. *Pride v. BIC Corp.*, 218 F.3d at 578 (6th Cir. 2000). That case didn't involve a fire investigation or the NFPA 921 guidelines.

Given these differences, the three cases don't affect the reasonableness of the district court's consideration of Mr. Wheat's investigation: He based his conclusions on witness statements and examined the physical evidence bearing on the cause and origin of the fire. Though he deviated in some respects from the guidelines, Mr. Hernandez

17

didn't flag these deviations in the motion filed in district court. And even now, Mr. Hernandez doesn't explain how these deviations would have affected the three opinions allowed into evidence. Based on what had been presented, the district court acted within its discretion by allowing the expert testimony despite some deviations from the NFPA 921 guidelines.

**4.    The alleged failure to sua sponte strike the response to a question didn't affect Mr. Hernandez's substantial rights.**

Mr. Hernandez also lasers in on Mr. Wheat's response to a question from defense counsel. The question involved possible corroboration of Mr. Hernandez's explanation for the fire; Mr. Wheat responded that he didn't believe that explanation because he had never seen a cigarette ignite gasoline:

| | |
|---|---|
| Mr. Hernandez: | So [Mr. Hernandez's grandmother] might have been sitting right there alongside [Mr. Hernandez's mother] whenever this gasoline exploded. True? |
| Mr. Wheat: | That could be a possibility. |
| Mr. Hernandez: | Thank you, sir. And wouldn't that kind of corroborate what Mr. Hernandez said about he was working with gasoline, and it exploded while he had a cigarette? |
| Mr. Wheat: | *I didn't believe Mr. Hernandez when he told me he had a—gasoline and a cigarette and had an explosion.* |
| Mr. Hernandez: | Okay. Because you're a human lie detector; right? |

18

Mr. Wheat:   No sir. I—I'm aware that gasoline doesn't start.

R. vol. 3, at 604 (emphasis added).

Mr. Hernandez argues that the district court should have sua sponte stricken Mr. Wheat's response ("I didn't believe Mr. Hernandez when he told me he had a—gasoline and a cigarette and had an explosion."). According to Mr. Hernandez, this response constituted improper testimony about his credibility.

## 4.1 We review for plain error.

Mr. Hernandez acknowledges that he didn't object to Mr. Wheat's response. Because Mr. Hernandez didn't object, he must satisfy the plain-error standard. *United States v. Rosales-Miranda*, 755 F.3d 1253, 1257 (10th Cir. 2014).[6] Under this standard, Mr. Hernandez must make four showings:

1. The district court committed error.

2. The error is clear or obvious under current law.

3. The error affected a substantial right.

4. The error seriously affected the fairness, integrity, or public reputation of judicial proceedings.

---

[6] The government argues that defense counsel invited the alleged error by asking Mr. Wheat if he believed that certain evidence could have corroborated Mr. Hernandez's explanation for the fire. We assume for the sake of argument that Mr. Hernandez's attorney didn't invite the alleged error.

*United States v. Griffith*, 65 F.4th 1216, 1218 (10th Cir. 2023), *cert. denied*, No. 23-5105, 2024 WL 1143722 (U.S. Mar. 18, 2024).

At oral argument, the government conceded the first and fourth showings (that the district court had erred and this error had seriously affected the fairness, integrity, or public reputation of judicial proceedings). We can assume for the sake of argument that Mr. Hernandez also made the second showing (an obvious error). With that assumption, we must determine whether Mr. Hernandez has shown an effect on a substantial right. *See id.*

**4.2    The response didn't affect Mr. Hernandez's substantial rights.[7]**

The required showing involves "a reasonable probability that but for the error claimed, the result of the proceeding would have been different." *Id.* (quoting *United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005)). To predict the probability of a different outcome, we consider four factors:

1.    The strength of the parties' cases

2.    Whether the improper evidence affected the parties' theory of the case

---

[7]    Mr. Hernandez also challenges the admissibility of Mr. Wheat's response on the ground that it was an "evidentiary harpoon." We need not address this argument in light of the discussion in the text: Even if the response had constituted an "evidentiary harpoon," the error wouldn't have affected Mr. Hernandez's substantial rights. *See United States v. Hooks*, 780 F.2d 1526, 1535 n.3 (10th Cir. 1986) (stating that "if no objection is interposed at trial [to an evidentiary harpoon], . . . reversal is only warranted upon a finding of plain error affecting substantial rights").

3.  The extent that the parties emphasized the improper opinion testimony

4.  Whether the jurors had their own opportunity to assess the defendant's credibility

*Id.*

### 4.2.1 The government's case was strong, and the response did not undermine Mr. Hernandez's theory of the case.

Unrelated to Mr. Wheat's response were two strong pieces of evidence:

1.  The dying declarations of the two victims (Mr. Hernandez's mother and grandmother), who told emergency responders that Mr. Hernandez had thrown gasoline on them and set them on fire.

2.  Mr. Hernandez's own statement to emergency responders that he had gotten mad and "shouldn't have done it."

R. vol. 3, at 404; *see* Part 1, above. Given the strong evidence of guilt, Mr. Hernandez didn't show a reasonable probability of a different outcome without Mr. Wheat's response to defense counsel's question.

Mr. Hernandez suggests that without Mr. Wheat's response, the jury might have convicted on a lesser charge of involuntary manslaughter based on a finding of reckless and wanton behavior. The different charges reflect a difference in severity: Second-degree murder includes *extreme* reckless and wanton behavior, and involuntary manslaughter involves *non-extreme* reckless and wanton behavior. *United States v. Wood*, 207 F.3d 1222, 1228–29 (10th Cir. 2000). But Mr. Hernandez's suggestion rests on

21

speculation, exaggerates the importance of a single sentence in a lengthy cross-examination, and disregards other admissible evidence that had made the same point in the disputed response.

First, Mr. Hernandez bases his argument on speculation about the reasons for the verdict. We don't know why the jury found second-degree murder. *See* R. vol. 1, at 318 (instructing the jury that the "malice aforethought" requirement for second-degree murder can mean "either to kill another person deliberately and intentionally, *or* to act with callous and wanton disregard for human life" (emphasis added)). And it's unclear how Mr. Wheat's response would have affected the jury's perception of his reckless and wanton behavior.

Second, Mr. Wheat's response constituted only a brief snippet in the cross-examination and an even briefer snippet in the trial itself. *See United States v. McHorse*, 179 F.3d 889, 902–03 (10th Cir. 1999).

Third, the substance of the response involved the improbability of Mr. Hernandez's explanation, which came in through other evidence. *See United States v. Rodriguez-Flores*, 907 F.3d 1309, 1322 (10th Cir. 2018). On direct examination, for example, Mr. Wheat said that he'd never been aware of a fire that had started from a cigarette's ignition of gasoline. And after Mr. Wheat gave the response at issue, he explained that he didn't believe Mr. Hernandez because "gasoline doesn't start." R. vol. 3, at 604. So even without the disputed response, the jury would have known why

Mr. Wheat didn't believe Mr. Hernandez's theory for the fire. *See United States v. Dazey*, 403 F.3d 1147, 1171–72 (10th Cir. 2005) (determining that an error in allowing testimony was harmless because the expert witness "carefully explained the source of his extensive knowledge" and "did not directly testify that [the] defendant actually violated the law"). With Mr. Wheat's explanation, the jury could independently assess Mr. Hernandez's theory.

**4.2.2 The government didn't emphasize Mr. Wheat's response to the question.**

We also consider whether the government's closing argument took advantage of Mr. Wheat's response to the question. *See United States v. Griffith*, 65 F.4th 1216, 1220 (10th Cir. 2023), *cert. denied*, No. 23-5105, 2024 WL 1143722 (U.S. Mar. 18, 2024). For example, when the government's closing argument emphasizes the disputed testimony, this emphasis could suggest an impact on the jury. *Id.*

The government's closing arguments omitted any mention of Mr. Wheat's response to the question. This omission substantially reduced the likelihood of prejudice. *See United States v. Rodriguez-Flores*, 907 F.3d 1309, 1323 (10th Cir. 2018) (concluding that opinion testimony on the defendant's credibility hadn't affected a substantial right in part because the government's closing argument had contained no mention of the disputed opinion on credibility); *United States v. McHorse*, 179 F.3d 889,

23

902–03 (10th Cir. 1999) (concluding that the lack of a reference to improper testimony in closing argument would weigh against a finding of an effect on substantial rights).

### 4.2.3 The jury could independently assess the scientific principles underlying Mr. Wheat's response.

Finally, we must consider whether the jurors had their own opportunity to assess the defendant's credibility. This factor cuts both ways. Mr. Hernandez didn't testify at trial, and the jury didn't see any recordings of Mr. Hernandez.

But Mr. Wheat wasn't testifying about whether Mr. Hernandez had lied. Instead, Mr. Wheat was expressing skepticism that a cigarette could ignite gasoline. The jurors could thus independently assess the scientific principles underlying Mr. Hernandez's explanation for the fire, and this factor doesn't suggest an effect on Mr. Hernandez's substantial rights.

* * *

Three factors favor the government, and one factor cuts both ways. So Mr. Hernandez hasn't shown an effect on his substantial rights, and the district court didn't plainly err by declining to sua sponte strike Mr. Wheat's response to defense counsel's question.

### 5.    The district court didn't err by allowing introduction of Mr. Wheat's photographs of the damage.

The final issue involves the admissibility of Mr. Wheat's photographs of the fire damage. In district court, Mr. Hernandez moved to

24

exclude the photographs, arguing that Mr. Wheat had entered the property in violation of the Fourth Amendment. The district court denied this motion.

**5.1     We conduct de novo review over the district court's denial of the motion.**

When we review this ruling, we

- view the evidence in the light most favorable to the government,

- accept the district court's findings of fact unless they are clearly erroneous, and

- consider de novo the ultimate question of reasonableness.

*United States v. Malone*, 10 F.4th 1120, 1123 (10th Cir. 2021). A finding of fact is clearly erroneous only if

- it lacks factual support or

- we have a definite and firm conviction that the district court clearly erred.

*Id.*

**5.2     Mr. Hernandez lacked a reasonable privacy interest in the remains of the mobile home.**

Mr. Wheat entered without a warrant to photograph the mobile home after the fire. Mr. Hernandez argues that Mr. Wheat needed a warrant because there were no exigent circumstances. Absent exigent circumstances, the warrant requirement applies to fire-damaged property if a reasonable privacy interest remains. *Michigan v. Clifford*, 464 U.S. 287,

25

292–93 (1984). But we don't need to decide the possibility of exigent circumstances because Mr. Hernandez had no reasonable privacy interest in the scene following the fire.

The Supreme Court has identified four factors to consider when determining whether privacy interests remain in a fire-damaged home:

1. The type of property

2. The amount of fire damage

3. The prior and continued use of the premises

4. The owner's efforts to secure it against intruders

*Id.* at 292. These factors suggest that no reasonable privacy interest remained because the fire was "so devastating that no reasonable privacy interests remain in the ash and ruin, regardless of the owner's subjective expectations." *Id.*

The mobile home was a private dwelling. But the damage to the mobile home was extensive. When Mr. Wheat came to take photographs, the mobile home looked like this:



Appellee's Supp. R. at 6, 9.

Given the appearance of the mobile home, the district court found that it had "essentially burned to the ground." R. vol. 1, at 211. Without anything of value remaining, no one could continue to use the mobile home for any purpose. *See United States v. Metzger*, 778 F.2d 1195, 1200 (6th Cir. 1985) (rejecting the existence of a privacy interest in a vehicle that had been "virtually demolished" by an explosion). Mr. Hernandez thus lacked a reasonable privacy interest in the scene. So Mr. Wheat did not violate the Fourth Amendment by entering without a warrant.

## 6.    Disposition

We affirm the district court's rulings and Mr. Hernandez's convictions.